## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

       *Plaintiff*,

v.

                              Case No. 6:23-cr-10109-EFM

RAMÓN GONZALEZ,

       *Defendant*.

## MEMORANDUM AND ORDER

Before the Court are Defendant Ramón Gonzalez's Motion to Suppress (Doc. 19) and Supplemental Motion to Suppress (Doc. 20). In his original Motion, Defendant argues that the traffic stop conducted by Drug Enforcement Administration Task Force Officer Daniel Weidner on September 12, 2023, violated the Fourth Amendment's prohibition against unreasonable searches and seizures. Defendant's Supplemental Motion seeks even wider relief, asking the Court to adopt a per se rule that the use of automated license plate readers ("ALPRs") violates the Fourth Amendment.

For the reasons stated below, this Court finds that Officer Weidner's reasonable suspicion justified his extended stop of Defendant—independent of his ALPR usage. Therefore, the Court denies Defendant's original Motion on the merits and denies his Supplemental Motion as moot.

## I.        Factual and Procedural Background[1]

DEA Task Force Officer Daniel Weidner works for the Narcotics Section of the Wichita Police Department.  In that capacity, he operates a single-purpose canine unit trained to detect narcotics.  He also drives an unmarked police vehicle. Even though his vehicle lacks any identifying markings, Officer Weidner believes anyone on the lookout for the police would identify it as such.  Namely, it is a Dodge Durango—a model often used by police officers—that has a light bar visible through the front window and generic steel wheels common to police vehicles.

On September 12, 2023, Officer Weidner sat in a parked vehicle on the side of the interstate turnpike near south Wichita, Kansas with his canine in the back of his car.  Around noon, Officer Weidner observed a white Ford pickup with a New Mexico license plate following very closely behind a semi-truck.  Officer Weidner pulled out onto the turnpike and began following the Ford pickup.  While tailing the pickup, Officer Weidner ran a license plate search through a program called ELSAG, an ALPR application.  Through that program, he learned that the pickup had recently crossed two license plate readers, one as it entered Kansas on Interstate 35 and the other on Interstate 20 in Ward County, Texas.  From these readings, Officer Weidner assumed that Defendant had traveled through Dallas.

Officer Weidner's perception of the pickup driver's hypervigilance aroused his suspicion. For example, Officer Weidner observed the pickup move into the left lane to pass several semi-trucks.  The driver followed close behind these semi-trucks to "blend in" and then attempted to move further away from Officer Weidner's vehicle. Officer Weidner believed that the pickup driver had identified his car as a police vehicle and was attempting to create distance between

---

[1] The facts in this section are the Court's findings pursuant to the evidentiary hearing held on May 17, 2024.

himself and Officer Weidner.  Around this time, Officer Weidner turned on his body camera, the footage of which the Government has submitted as Government's Exhibit 2.  Because the timing of events is integral to Defendant's first Motion, the Court will reference the following facts by the time they occurred in the body camera footage.

At approximately 30 seconds, Officer Weidner turned on his police lights and stopped the pickup for violating K.S.A. § § 8-1523(a).[2]  After the pickup pulled over to the side of the turnpike, Officer Weidner exited his vehicle and walked to the pickup.

As he approached, Officer Weidner noted the equipment in the bed of the truck, which appeared to be a fuel tank and compressors.  Officer Weidner testified that the equipment looked like it had never been used, as it lacked scratches commonly found from hoses dangling or any fuel spill marks.  Furthermore, the external fuel tank was missing the pump and had the factory plug still inserted into the pump station.  Based on his training and experience, Officer Weidner believed the equipment looked staged.

Upon reaching the vehicle, Officer Weidner asked for permission to open the passenger side door, which Defendant granted.[3]  Officer Weidner informed Defendant that he had pulled him over for driving too close behind the semi-truck.

Immediately, Defendant claimed that he was nearly out of gas and was looking for a gas station.  Defendant then produced a toll card and stated that the toll attendant had given him directions to find a gas station, but he became confused while looking for one.  The toll card indicated that Defendant entered the turnpike at mile 42.  Based on Officer Weidner's knowledge

---

[2] K.S.A. § § 8-1523(a) states, "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway."

[3] Although Defendant used an interpreter during the hearing, the video taken from Officer Weidner's body camera shows Defendant conversing in English with no apparent difficulty.

of the Wichita area, he knew that there were two gas stations very close to the mile 42 exit and onramp.

At 2 minutes and 22 seconds, Officer Weidner asked Defendant for his driver's license. Defendant began reaching around the inside on the pickup as if looking for it but stated that he left his driver's license in a hotel. Officer Weidner considered this inconsistent behavior to be suspicious and indicative of falsehood.

Officer Weidner then asked Defendant who the truck was registered to. Defendant hesitated before responding that the truck was registered to his wife. He then produced the truck's registration. When asked his wife's name, Defendant again hesitated and then stated it was Denis or Denise Rodriguez. The record is unclear as to how the registrant's first name is spelled. Officer Weidner originally assumed the name was pronounced "Dennis" before Defendant corrected him. Officer Weidner noted that the truck had been registered only the day before.

At 3 minutes and 24 seconds, Officer Weidner asked Defendant how long he had the truck, to which Defendant responded that he and his wife bought it two weeks ago.

At 3 minutes and 35 seconds, Officer Weidner asked Defendant if he was working at that time. Defendant responded that he was heading to his work. When asked where, Defendant replied that he was going to work with his uncle in Kansas, without specifying which city. Officer Weidner asked Defendant if he was heading to Kansas City, and Defendant said he was.

At 3 minutes and 49 seconds, Officer Weidner told Defendant to come to his police vehicle so he could obtain Defendant's name and run a check or verification on it from the police vehicle's computer. As they were walking toward the police vehicle, Officer Weidner looked at the bed of Defendant's pickup and stated, "Man, you got a lot of stuff." Pointing to the compressors, Defendant stated they were for roofing. Officer Weidner asked whether Defendant could have

used the gasoline from the external fuel tank for his truck, to which Defendant responded that the pump was missing.  After Officer Weidner asked where the pump was, Defendant stated the pump had been stolen.

Defendant entered Officer Weidner's vehicle at approximately 5 minutes into the video. Officer Weidner again asked Defendant where he was headed, with Defendant not specifying where he was going but stating he had an hour and half left to drive.  Officer Weidner asked Defendant if he was from New Mexico.  Defendant answered in the affirmative, specifying that he was from Sunland Park.  He then stated he was going to help his uncle with roofing and sheet metal for at least two weeks.  When Officer Weidner then asked Defendant where he slept the night before, Defendant answered that he stayed at a gas station.

At 6 minutes and 30 seconds, Officer Weidner asked for Defendant's last name.  Defendant responded, "Gonzalez."   Upon Officer Weidner asking for Defendant's first name, Defendant responded, "Ray."  After a few other questions regarding his name, birthday, and social security number, Officer Weidner asked for Defendant's address.  Defendant said he did not remember, and that he had moved there six months ago.  He did remember that it was in Sunland Park, New Mexico.  Officer Weidner remembered Sunland Park being a suburb of El Paso, Texas.  According to Officer Weidner, El Paso is a known drug source city.  Throughout this time, Officer Weidner was searching databases on his computer attempting to identify Defendant based on his name and residence.

At approximately 8 minutes, Officer Weidner commented that Defendant was "very, very nervous" and told him to just relax.  He stated that he was not going to take Defendant to jail for driving without a license.  He continued to ask Defendant further questions about the truck and its registration.

Officer Weidner asked Defendant if Ray was short for anything.  Defendant replied in the negative.  Officer Weidner reiterated, "It's not short for Ramón, Ramundo, or anything?"  Defendant answered, "Raymond."  Officer Weidner continued searching on his computer but was still unable to identify Defendant.

Around 10 minutes and 28 seconds, the video shows Officer Weidner opening Google Maps on his computer and looking up Sunland Park, New Mexico.  He did so to confirm his memory that Sunland Park was a suburb of El Paso.  After 45 seconds, Officer Weidner asked Defendant, "When were you in Dallas?"  At the same time, Officer Weidner opened an ALPR application and viewed photos of Defendant's pickup.  At 11 minutes and 27 seconds, Officer Weidner resumed searching various databases for Defendant's identity.

At 13 minutes and 10 seconds, Officer Weidner asked Defendant for his uncle's name.  Defendant gave his uncle's name, and Officer Weidner followed up by asking where Defendant's uncle lived.  Defendant replied he did not know and that his uncle would text him the address when he was closer.  Officer Weidner considered this to be an example of compartmentalization, commonly used by drug traffickers in case the person carrying drugs is caught enroute to the drop off.

At 13 minutes and 40 seconds, Officer Weidner told Defendant that he did not have any driver's license and asked if he used to have one.  Defendant responded yes and said he used to have one from Colorado.  Officer Weidner then attempted to look up Defendant's previous driver's license.

Finally, at 14 minutes and 12 seconds, Officer Weidner found a Colorado driver's license for "Ramón Gonzalez" which matched Defendant's personal information and had an expiration date of October 19, 2014.  Afterwards, Officer Weidner began asking Defendant more questions

about when he left Sunland Park and other travel plans.  While doing so, Officer Weidner reopened Google Maps and other ALPRs to review Defendant's travel route from New Mexico to Kansas.

Because the rest of the encounter is less relevant to the present Motion, the Court will briefly address the remaining facts.  Officer Weidner soon confronted Defendant about his suspicion that there were drugs in Defendant's truck.  He then asked for Defendant's consent to search his truck, which Defendant gave.  Along with his canine, Officer Weidner searched the pickup, finding three bags of white powder which were later identified as cocaine.  He also found $10,000 in cash within the truck.  Shortly thereafter, Officer Weidner arrested Defendant for trafficking controlled substances and placed him in custody.

On September 29, 2024, Defendant was released on bond.  Through appointed counsel, Defendant filed the present Motions on February 15, 2024, seeking suppression of the evidence seized from Defendant's vehicle.  After receiving briefing from both parties, the Court held an evidentiary hearing on May 17, 2024.  During the hearing, the Government presented Officer Weidner as the sole witness.  Because the hearing went longer than anticipated, the Court continued the hearing on May 20, 2024, so that each side could present closing arguments.  At the end of the May 20 hearing, the Court directed each party to submit further briefing on whether Defendant's consent to Officer Weidner search of his vehicle would render any unreasonable seizure issues moot.  The parties have each submitted the additional briefing, and the Motions are now ripe for ruling.

## II.    Legal Standard

The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."[4]

---

[4] U.S. Const. amend. IV.

Under the exclusionary rule, "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search or seizure."[5]  If a search or seizure violates the Fourth Amendment, the "fruit of the poisonous tree" doctrine prohibits the admission of any subsequently obtained evidence, including information, objects, or statements.[6] Searches must be authorized by a warrant unless an exception to the warrant requirement applies.[7] The Government bears the burden to prove that the conduct implicating the Fourth Amendment was reasonable.[8]

## III.    Analysis

As an initial matter, the parties have stipulated that Defendant was lawfully operating the Ford with permission of his spouse who is the registered owner of the vehicle.  A person in lawful possession of a vehicle has an expectation of privacy and control that implicates Fourth Amendment protections.[9]  Because Defendant was lawfully possessing the pickup, the Court concludes he has standing to assert his Fourth Amendment rights in the present Motions.

In his original Motion, Defendant claims that the traffic stop violated his Fourth Amendment right to be free from unreasonable seizures because the traffic stop was unreasonably extended.  The seminal case on this subject is *Rodriguez v. United States*.[10]  There, the Supreme Court granted certiorari to determine "whether police routinely may extend an otherwise-

---

[5] *United States v. Calandra*, 414 U.S. 338, 347 (1974).

[6] *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 754 n.3 (10th Cir. 2021) (citing *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963) (further citations omitted).

[7] *California v. Carney*, 471 U.S. 386, 390 (1985).

[8] *United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th Cir. 2001) (further citations omitted).

[9] *Byrd v. United States*, 584 U.S. 395, 398–99 (2018).

[10] 575 U.S. 348 (2015).

completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff."[11]  The Supreme Court first recognized that "[a] seizure for a traffic violation justifies a police investigation of that violation."[12]  Addressing the reasonable amount of time an officer may detain someone for a traffic stop, the Court held "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns."[13]  "Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose."[14]  Accordingly, once the reason for the stop is "or reasonably should have been" completed, the officer no longer has any authority to detain the individual.[15]  If the stop continues, it becomes unlawful.[16]  In fact, "[e]ven *de minimis* delays caused by unrelated inquiries violate the Fourth Amendment in the absence of reasonable suspicion."[17]

The main purpose of a traffic stop is to issue a traffic ticket or a warning.[18]  But "an officer's mission includes ordinary inquiries incident to the traffic stop."[19]  "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.[20]  Furthermore, other *de minimis* delays—i.e., requiring the individual to exit the vehicle out of concern for the

---

[11] *Id.* at 353.

[12] *Id.* at 354.

[13] *Id.* (further citations omitted).

[14] *Id.* (further citation, quotations, and brackets omitted).

[15] *Id.*

[16] *Id.* (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

[17] *United States v. Frazier*, 30 F.4th 1165, 1173 (10th Cir. 2022).

[18] *Rodriguez*, 575 U.S. at 354–55.

[19] *Id.* at 355 (further citation, quotations, and brackets omitted).

[20] *Id.*

officer's safety—are permissible so far as they relate to interests stemming from mission of the traffic stop.[21]

The Supreme Court cautioned, however, that measures meant to investigate "ordinary criminal wrongdoing" do not fall within the confines of a normal traffic stop.[22]  For example, a dog sniff has no relation to the purposes or goal of a traffic stop.[23]  Thus, "[o]n-scene investigation into other crimes" necessarily detours from the mission of the original traffic stop.[24]  The Tenth Circuit has referred to an ordinary criminal investigation incident to a traffic stop as a "*Rodriguez* moment"—that is, "the moment when the officer extended the stop by engaging in non-traffic inquiries."[25]

With this guidance in mind, the Tenth Circuit articulated the following test: "an unlawful seizure occurs when an officer (1) diverts from the traffic-based mission of the stop to investigate ordinary criminal conduct, (2) in a way that 'prolongs' (i.e., adds time to) the stop, and (3) the investigative detour is unsupported by an independent reasonable suspicion."[26]  Keeping this test in mind, the Court will determine when the first Rodriguez moment occurred before analyzing whether Officer Weidner possessed independent reasonable suspicion at that time.

## A.    The first *Rodriguez* moment occurred when Officer Weidner detoured from the traffic stop to look up Sunland Park on Google Maps.

The parties do not dispute that the first two elements of the Tenth Circuit's test have been met.  They only dispute *when* they were met.  The parties also dispute whether Officer Weidner

---

[21] *Id.* at 356.

[22] *Id.* at 355 (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 40–41 (2000)).

[23] *See id.* at 355–56.

[24] *Id.* at 356.

[25] *Frazier*, 30 F.4th at 1179.

[26] *Id.* at 1173.

had reasonable suspicion that Defendant was engaging in drug trafficking when the proposed *Rodriguez* moment or moments occurred.

Before addressing reasonable suspicion, the Court must determine exactly when the first *Rodriguez* moment occurred. The Government contends that the first *Rodriguez* moment did not happen until Officer Weidner identified Defendant around the 14-minute mark. This is because confirming Defendant's identity was necessary for Officer Weidner to issue him a traffic ticket and check for outstanding warrants. Therefore, the traffic stop remained ongoing until Officer Weidner identified Defendant. Once he did so, the traffic stop's mission had been completed. The fact that he continued to detain Defendant means that he triggered a Rodriguez moment and diverted from the mission of the initial traffic stop.

Although Defendant agrees that a *Rodriguez* moment occurred around the 14-minute mark, he argues that other *Rodriguez* moments occurred before then. The first several of Defendant's proposed *Rodriguez* moments concern Officer Weidner's questions about Defendant's travel plans. But the Tenth Circuit has held that "[o]fficers may, in the name of officer safety and 'to get a feel for what's going on,' make limited inquiries into travel plans and the like" without unlawfully prolonging the traffic stop.[27] Therefore, Officer Weidner's questions about where Defendant had come from, where he was going, and other innocuous inquiries did not trigger a *Rodriguez* moment.

Defendant next argues that Officer Weidner's comment "Man, you got a lot of stuff" and follow up questions at 3 minutes and 49 seconds constituted an investigatory inspection and inquiry. But this ignores the fact that it was Defendant who volunteered that the equipment was for roofing and that he had both electric and gas compressors. Officer Weidner's following

---

[27] *Id.* at 1175 (further citation omitted).

comments and questions were either conversational (i.e., "Oh you got electric and gas.") or related to Defendant's travel plans ("You don't have any gas in there to put in that truck?").  In total, the conversation at the back of Defendant's vehicle lasted 31 seconds.

Although the Tenth Circuit has generally stated that *de minimis* delays caused by unrelated inquires violate the Fourth Amendment,[28] Defendant's application of that principle goes too far. Addressing a similar argument, the concurrence in *United States v. Hayes*[29] emphasized that although a seven or eight minute may suffice, a five-second delay does not constitute a *Rodriguez* moment.[30]  This is because "[t]he Fourth Amendment is not a guarantee against all seizures, but only against unreasonable seizures.  Regardless of the length of delay, the 'central inquiry' under the Fourth Amendment is the reasonableness 'in all the circumstances' of the seizure."[31]  The concurrence continued:

> Defendant effectively endorses a rule that would create a per se violation of the Fourth Amendment's proscription against unreasonable seizures anytime an officer appears to so much as pause or "go off course," however briefly, while pursuing the mission of the stop.  After all, Defendant tells us that "unsupported delay of any duration" violates the Fourth Amendment.  Under Defendant's approach, an officer's failure to continue to pursue the mission of the stop for even one or two seconds would render a defendant's detention unlawful as a matter of law.[32]

Ultimately, the concurrence concluded that "Defendant's approach simply is at odds with the Fourth Amendment's reasonableness requirement."[33]

---

[28] *See, e.g.*, *United States v. Mayville*, 955 F.3d 825, 830 (10th Cir. 2020).

[29] 62 F.4th 1271, 1275 (10th Cir. 2023) (Baldock, J., concurring).

[30] *Id.* (contrasting five seconds with a seven or eight minute stop.

[31] *Id.* at 1277 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)); *see also United States v. Cortez*, 965 F.3d 827, 837 (10th Cir. 2020) ("[R]easonableness—rather than efficiency—is the touchstone of the Fourth Amendment.").

[32] *Hayes*, 62 F.4th at 1277 (Baldock, J., concurring) (further citations omitted).

[33] *Id.*  (Baldock, J., concurring).

Even though it is not binding, the Court finds the *Hayes* concurrence persuasive and applicable to this case. In all practicality, the Court cannot find that a 31-second side conversation while walking from the defendant's vehicle to the officer's vehicle is unreasonable within any sense of the term. There is no indication that this conversation enroute from one vehicle to another prolonged the stop in any way. To adopt Defendant's interpretation of "*de minimis*" requires finding that even a one or two second delay unrelated to the traffic stop would violate a person's constitutional rights. In short, Defendant's argument is a classic example of *reductio ad absurdum*, reducing the Fourth Amendment's prohibition on unreasonable seizures to a caricature of itself.

Regardless, the Court recognizes that the exclusionary rule "is a 'prudential' doctrine."[34] The Supreme Court has repeatedly held that its sole purpose "is to deter future Fourth Amendment violations."[35] Because of the "substantial social costs generated by the rule. . . the deterrence benefits of suppression must outweigh its heavy costs."[36] Thus,

> [w]hen the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way.[37]

Even if the Court were to find that this 31-second conversation violated Defendant's Fourth Amendment rights, Officer Weidner's conduct hardly appears deliberate, reckless, or grossly negligent. At worst, it would constitute simple, isolated negligence. Thus, the exclusionary rule's deterrence value based on this proposed "*Rodriguez* moment" is negligible and does not outweigh

---

[34] *Davis v. United States*, 564 U.S. 229, 236 (2011) (further citation omitted).

[35] *Id.* at 236–37.

[36] *Id.* at 237 (further citations and quotations omitted).

[37] *Id.* at 238 (further citations and quotations omitted).

the substantial social costs of applying the rule.[38]  Indeed, it is not clear what the Court would be attempting to deter beyond small talk between officers and individuals involved in traffic stops.

To clarify, the Court does not believe that the 31-second conversation was an unreasonable seizure.  In any event, the Court remains convinced that applying the exclusionary rule based on that conversation would be inappropriate in this case.  Therefore, the Court holds that the conversation at the back of Defendant's pickup was not a *Rodriguez* moment.

Defendant next argues that a *Rodriguez* moment occurred when Officer Weidner looked up Sunland Park on Google Maps at 10 minutes and 48 seconds.  Officer Weidner testified that his reason for doing so was because he remembered Sunland Park being a suburb of El Paso, which is one of the largest centers for direct drug distribution in the United States.  Thus, by Officer Weidner's own admission, reviewing Sunland Park on Google Maps was an investigation into ordinary criminal conduct.

This "detour" lasted approximately one minute before Officer Weidner resumed searching for Defendant's identity in the databases.  Once again, the almost negligible delay seems to stretch the Fourth Amendment's definition of "unreasonable."[39]  But for the purposes of this Order, the Court will assume without deciding that the one-minute delay caused by Officer Weidner looking at Google Maps constituted a *Rodriguez* moment.  With that assumption, the Court must determine whether Officer Weidner had a reasonable suspicion that Defendant was engaging in drug trafficking at that time.

---

[38] *See id.* at 238 ("When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs.  But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated the deterrence rationale loses much of its force, and exclusion cannot pay its way." (further citations and quotations omitted)).

[39] The Court likewise has its doubts that the one-minute pause would warrant suppression.  But that issue is beyond the scope of this Order.

**B.**   **By the time Officer Weidner reviewed Sunland Park on Google Maps, he had reasonable suspicion that Defendant was trafficking drugs.**

When the officer conducting a traffic stop begins investigating other potential crimes, the stop is only permissible if the officer has "independent reasonable suspicion" that the subject of the stop committed those crimes.[40]  Thus, "when reasonable suspicion is lacking at the '*Rodriguez* moment,' seizure of the individual remains illegal from that point forward."[41]

According to the Tenth Circuit,

Reasonable suspicion requires a particularized and objective basis for suspecting criminal conduct under a totality of the circumstances.  While reasonable suspicion cannot be based upon a mere hunch, it also need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.  The government bears the burden of satisfying this standard, but it is not an onerous one.[42]

In determining whether the officer had reasonable suspicion, courts may "consider only those facts known to the [officer] at the point he diverted from his traffic-based mission."[43]  Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."[44]   "An officer's action is reasonable as long as the circumstances, viewed objectively, justify the action regardless of the individual officer's state of mind."[45]   However, courts must approach those facts from an objective perspective, considering the totality of the circumstances.[46]  Nevertheless, courts "accord deference to an officer's ability to distinguish between innocent and

---

[40] *United States v. Dawson*, 90 F.4th 1286, 1291 (10th Cir. 2024).

[41] *Frazier*, 30 F.4th at 1179.

[42] *Id.* at 1174.

[43] *Id.*

[44] *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

[45] *United States v. Morales*, 115 F. Supp. 3d 1291, 1297–98 (D. Kan. 2015).

[46] *See Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006).

suspicious actions."[47]  "Thus, the evaluation is made from the perspective of the reasonable *officer*, not the reasonable person."[48]

Because the Court assumes for the purposes of this Order that the first *Rodriguez* moment occurred roughly 10 minutes into the video, the question becomes whether Officer Weidner had reasonable suspicion Defendant was transporting drugs at that time.  After viewing the totality of the circumstances from the perspective of a reasonable officer, the Court concludes the answer is yes.  The Court relies on seven factors in reading this conclusion.

*First*, Officer Weidner testified that Defendant's driving behavior—following semitrucks too closely and then passing them to move ahead—indicated hypervigilance.  Although an ordinary person might not read into these traffic maneuvers, the Court credits Officer Weidner's testimony that a trained officer would conclude Defendant was first attempting to blend in with traffic and then tried putting distance between himself and Officer Weidner.  Together, Officer Weidner testified these behaviors may suggest hypervigilant.  He further testified that such hypervigilance indicates a desire to avoid notice by police officers, which may suggest criminal activity.[49]  Therefore, Defendant's hypervigilance favors finding reasonable suspicion, if only slightly.

*Second*, Officer Weidner testified that the equipment in Defendant's truck bed appeared staged.  Not only were ordinary scratches and fuel spills completely absent, but the pump was missing, and the factory plug was still plugged into the pump hole.  Of course, having new equipment in the back of a truck may be entirely innocent in and of itself.  But based on Officer

---

[47] *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010).

[48] *Id.* (further citation, quotations, and brackets omitted).

[49] *See, e.g.*, *United States v. Dell*, 487 F. App'x 440, 445 (10th Cir. 2012) (stating evasive behavior via "an obvious attempt to evade officers" may suggest criminal activity(further citations, quotations, and bracket omitted)).

Weidner's testimony, it could suggest a staged setup to a reasonable officer. Furthermore, the fact that the factory plug had not even been removed appears at odds with Defendant's story that the pump was stolen, arousing further suspicion that Defendant was attempting to deceive Officer Weidner.

*Third*, Defendant evidently lied in telling Officer Weidner about leaving his driver's license in a hotel. Not only did Defendant later claim that he slept in his truck—not a hotel—the night before, but he acted as if he was looking around the inside of his vehicle for his driver's license when Officer Weidner asked him for it. A reasonable officer could interpret this contradictory behavior as indicative of deceitfulness.

*Fourth*, Officer Weidner testified that drug carriers often purchase and register vehicles shortly before transporting drugs. Therefore, the fact that Defendant bought his truck two weeks prior and only registered it the day before would reasonably contribute to an officer's suspicion that Defendant was engaging in drug trafficking.

*Fifth*, the truck was registered to Denis Rodriguez. Officer Weidner testified that drug traffickers often drive a vehicle registered to a third party instead of using their personal vehicle. Furthermore, Defendant initially claimed that Denis Rodriguez was his wife but told Officer Weidner that his own last name was Gonzalez. The Court understands that spouses may have different last names, but by this point, Defendant had already aroused Officer Weidner's suspicion when giving inconsistent signals regarding his driver's license. Therefore, a reasonable officer could consider the truck's registration bearing a different last name than Defendant's a suspicious circumstance indicating possible drug trafficking.

*Sixth*, Defendant claimed to be from Sunland Park, a suburb of El Paso. The Tenth Circuit has previously held that officers may rely on the known reputation of a "high crime area" as one

factor in finding reasonable suspicion.[50]  According to the credible testimony offered by Officer Weidner, El Paso is a known a drug distribution center, a fact Officer Weidner knew was aware of during the stop.  Furthermore, Officer Weidner remembered that Sunland Park was a suburb of El Paso before confirming his memory via Google Maps.  While alone insufficient, this factor supports finding that Officer Weidner had reasonable suspicion that Defendant was engaged in drug trafficking.

*Seventh*, Defendant appeared very nervous throughout the encounter.  The Tenth Circuit has cautioned that "nervousness is 'of limited significance' in determining whether reasonable suspicion exists."[51]  Nevertheless, "[e]xtreme and persistent nervousness . . . is entitled to somewhat more weight."[52]  In determining whether a person's nervousness is "extreme," courts may "defer to the ability of a trained law enforcement officer to distinguish between innocent and suspicious action."[53]  But courts must be able to reference "specific indicia that the defendant's nervousness was extreme, rather than credit an officer's naked assertion."[54]  Specific indicia may include the defendant changing the topic, swallowing hard, and trembling, as well as the defendant's continued nervousness even when an officer informs the defendant that he will only receive a ticket.[55]

---

[50] *United States v. Young*, 99 F.4th 1136, 1145 (10th Cir. 2023), *as corrected* (May 24, 2023) ("Mr. Young offers little to show the district court erred in relying on the high-crime nature of the West Mesa under the totality of the circumstances."); *see also United States v. Gaines*, 857 F. App'x 454, 464 (10th Cir. 2021) ("[T]he fact that conduct occurs in an area known for criminal activity is an appropriate factor to consider in determining whether reasonable suspicion exists.").

[51] *Simpson*, 609 F.3d at 1147 (further citations and quotations omitted).

[52] *Id.* at 1148 (further citations and quotations omitted).

[53] *Id.* (quoting *Zubia–Melendez*, 263 F.3d at 1162).

[54] *Id.*

[55] *Id.* (citing *United States v. Santos*, 403 F.3d 1120, 1127 (10th Cir. 2005)).

Here, Officer Weidner testified that Defendant appeared very nervous to him, even after Officer Weidner assured Defendant that he was not going to arrest him for driving without a license.    Throughout the encounter, Defendant was breathing heavily, speaking rapidly, gesticulating wildly, and changing the subject to unrelated information without prompting.   For example, Defendant told Officer Weidner that he needed gas for his pickup immediately after Officer Weidner informed Defendant that he had been following a semi-truck too closely.   Needing gas had nothing to do with Officer Weidner's stated reasons for the stop.   Officer Weidner also testified that Defendant would reroute the conversation back to his need for fuel and working for his uncle.   As per Officer Weidner's testimony, these pervasive and persistent symptoms of anxiety led him to conclude that Defendant was extremely nervous because of a guilty mindset.   Given that Officer Weidner is a trained law enforcement officer, the Court will defer to his ability to distinguish between potentially innocent conduct and nervousness indicative of criminality.   Therefore, this factor favors finding that Officer Weidner had reasonable suspicion.

To summarize, many of the above criteria are fully capable of innocent explanations.   And individually, it may be that none would allow the Court to find reasonable suspicion.   But taken together, they form a particularized and objective basis for a reasonable officer in Officer Weidner's position to suspect that Defendant was trafficking drugs.   Therefore, the Court concludes that Officer Weidner had reasonable suspicion sufficient to support an independent investigation into Defendant's ordinary criminal conduct—namely, drug trafficking.

Because Officer Weidner developed reasonable suspicion that Defendant was transporting drugs before the first *Rodriguez* moment, his extension of the stop was not unlawful.   Therefore, Officer Weidner did not violate Defendant's Fourth Amendment rights.   Accordingly, the Court denies Defendant's initial Motion to Suppress.   Furthermore, because the Court reaches this

conclusion without considering Officer Weidner's use of the ALPRs, the Court need not reach the merits of Defendant's Supplemental Motion and denies the same as moot.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress (Doc. 19) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Supplemental Motion to Suppress (Doc. 20) is **DENIED** as moot.

**IT IS SO ORDERED.**

Dated this 4th day of June, 2024.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE